*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MJC, Minor.

FOR PUBLICATION
November 21, 2023
9:05 a.m.

No. 365616
Oakland Circuit Court
Family Division
LC No. 19-879052-NA

Before: BOONSTRA, P.J., and GADOLA and MALDONADO, JJ.

MALDONADO, J.

Respondent-father appeals by right the trial court's order terminating his parental rights to his minor child, MJC, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent).[1] We affirm.

## I. BACKGROUND

In December 2019, MJC was removed from her mother's care and placed with respondent-father after testing positive for cocaine, heroin, and methadone shortly after birth. In October 2020, MJC was removed from respondent-father's care and placed with a paternal aunt after both the child and respondent-father tested positive for fentanyl and opiates. Respondent-father was ordered to participate in and benefit from various services, which petitioner, the Department of Health and Human Services (DHHS), provided. The primary goal of these services was to achieve and maintain sobriety to help him be reunited with his child; however, respondent-father was chronically noncompliant and, ultimately, unable to achieve sobriety. In October 2022, respondent-father pleaded no contest to the allegations in a supplemental petition that supported statutory grounds to terminate his parental rights. Subsequently, following a best-interests hearing, the trial court found that termination was in MJC's best interests, and accordingly, it ordered termination. This appeal followed.

---

[1] The mother's parental rights were also terminated, but she is not a party to this appeal.

## II. REASONABLE EFFORTS

DHHS's failure to create written case service plans was a plain error that would warrant reversal had the issue been properly preserved, but respondent-father cannot establish that the error affected his substantial rights. Moreover, the record establishes that DHHS made reasonable efforts to prevent termination.

## A. STANDARDS OF REVIEW AND GOVERNING LAW

This Court generally reviews for clear error a trial court's decision regarding reasonable reunification efforts. *In re Atchley,* 341 Mich App, 338: 990 NW2d 685 (2022); *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). However, to preserve an argument about reasonable efforts for family reunification, a respondent-parent must object to the services at the time they are offered,[2] and respondent-father failed to do so. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). Therefore, this issue is unpreserved, and review of unpreserved issues in termination cases is for plain error affecting substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011); *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008).[3] "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *VanDalen*, 293 Mich App at 135 (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Utrera*, 281 Mich App at 9. The party asserting plain error bears the burden of persuasion with respect to prejudice. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 70 (2020).

This Court reviews de novo the trial court's interpretation and application of statutes and court rules. *In re Sanders*, 495 Mich 394, 403; 852 NW2d 524 (2014). This Court's "primary task in construing a statute, is to discern and give effect to the intent of the Legislature." *In re AGD*, 327 Mich App 332, 343; 933 NW2d 751 (2019). "The words used by the Legislature in writing a statute provide us with the most reliable evidence of the Legislature's intent." *Drew v Cass County*, 299 Mich App 495, 499; 830 NW2d 832 (2013). Courts must give meaning "to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or rendered nugatory. Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent." *Vermilya v Delta College Bd of Trustees*, 325 Mich App 416, 419; 925 NW2d 897 (2018) (quotation marks

---

[2] The Michigan Supreme Court has expressed skepticism about this rule but declined to overturn it. See *In re Hicks/Brown*, 500 Mich 79, 88-89; 893 NW2d 637 (2017).

[3] This Court recently clarified that the plain-error rule does not apply to claims of error raised in civil cases. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No., 359090); slip op at 5. However, this Court specifically excepted termination of parental rights cases from its holding because they "present different constitutional considerations." *Id*. at 5 n 3.

and citation omitted). When determining the meaning of a statute's plain language, this Court examines "the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme." *Kemp v Farm Bureau Gen Ins Co of Mich*, 500 Mich 245, 252; 901 NW2d 534 (2017).

"A waiver consists of the intentional relinquishment or abandonment of a known right." *Patel v Patel*, 324 Mich App 631, 634; 922 NW2d 647 (2018) (quotation marks and citations omitted). "Magic words are unnecessary to effectuate a valid waiver, but a waiver must be explicit, voluntary, and made in good faith." *Id*. "[A] valid waiver may be shown by express declarations or by declarations that manifest the parties' intent and purpose or be an implied waiver evidenced by a party's decisive, unequivocal conduct reasonably [implying] the intent to waive." *Id*. "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *Cadle Co v Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009).

"In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal . . . ." *Fried*, 266 Mich App at 542. An order terminating parental rights must state "whether reasonable efforts have been made to . . . rectify the conditions that caused the child's removal from his or her home." MCL 712A.18f(4). "Reasonable efforts to reunify the child and family must be made in all cases except if" certain aggravating circumstances exist. MCL 712A.19a(2). "[T]ermination is improper without a finding of reasonable efforts." *In re Hicks/Brown*, 500 Mich 79, 90; 893 NW2d 637 (2017). "As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86. In addition to DHHS's duty to offer services to the respondent-parent, the respondent-parent has a duty to participate in and benefit from the services. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

## B. WAIVER

DHHS argues that respondent-father waived his right to contest the adequacy of its reunification efforts by entering a plea of no contest with respect to the statutory grounds. Because DHHS's duty to make reasonable efforts toward reunification is distinct from its duty to prove at least one statutory ground for termination by clear and convincing evidence, this argument is without merit.

DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *Hicks/Brown*, 500 Mich at 85, citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). This duty is subject to limited exceptions for certain aggravated circumstances delineated in MCL 712A.19a(2), but it is undisputed that no such circumstances are present in this case. Failure to make reasonable efforts toward reunification warrants reversal. *Hicks/Brown*, 500 Mich at 90. DHHS argues that respondent-father, by pleading no contest to the statutory grounds for termination, waived his right to bring a reasonable efforts challenge on appeal.

There is no binding authority that supports DHHS's position. DHHS cites the lead opinion in *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.). In that opinion,

Justice Corrigan opined that "[t]he adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *Id*. The first problem with DHHS's reliance on this case is that it is a plurality opinion and therefore is not binding. See *Tennine Corp v Boardwalk Commercial LLC*, 315 Mich App 1, 22 n 6; 888 NW2d 267 (2016) (stating that "decisions in which a majority of the participating justices do not agree with the reasoning are not binding"). By no means do we suggest that plurality opinions of our Supreme Court should be cast aside, for they can serve as compelling sources of persuasion; nevertheless, *Rood* does not support DHHS's position. The statement that the quality of reunification efforts "*may bear* on whether there is sufficient evidence to terminate a parent's rights" is a far cry from saying that statutory grounds and reasonable efforts are so inextricably linked that one may not concede the former but contest the latter. *Rood*, 483 Mich at 89. Rather, *Rood* stands for the proposition that the quality of services offered might sometimes be probative of whether a statutory ground has been established. For example, pursuant to MCL 712A.19b(3)(c)(*i*), termination may be warranted if, after 182 days have elapsed, the conditions resulting in adjudication remain present and "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." If a parent fails to make improvements despite having received adequate services, this would suggest that the conditions are unlikely to be rectified in the foreseeable future. On the other hand, if the parent had received inadequate services, this could suggest that the barriers to reunification could yet be lifted if the parent is given adequate support.

DHHS also cites *Fried*, 266 Mich App at 541. In particular, DHHS relied on the following sentence: "Although respondent has not expressly challenged the sufficiency of the evidence for termination of his parental rights, his contention that reasonable services were not offered ultimately relates to the issue of sufficiency." *Id*. This Court then stated that it had reviewed the record and concluded "that the evidence was sufficient to establish that the primary condition leading to adjudication . . . continued to exist at the time of the termination hearing." *Id*. We disagree with DHHS's contentions regarding the breadth of this case's holding. First, DHHS's position requires a series of inferences because this Court never actually stated that the issue of reasonable efforts is subsumed by the statutory grounds. To agree with DHHS, we would need to conclude that the statement that this particular respondent's reasonable efforts argument "relates to the issue of sufficiency" implies that challenges to the adequacy of the services offered by DHHS are actually challenges to the court's finding that there were grounds for termination. From there, we would need to infer that a respondent cannot waive a challenge to the statutory grounds while preserving a challenge to reasonable efforts. We decline to read so much into *Fried*. Moreover, in *Fried*, this Court did perform a separate analysis of DHHS's reunification efforts immediately after explaining its conclusion that the statutory grounds had been proven; this lends additional support to our conclusion that *Fried* does not stand for the proposition for which DHHS cites it.[4]

---

[4] DHHS also cites *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011), but this case clearly is not on point because the respondent did not even raise a reasonable efforts argument.

The statutory framework makes clear that the Legislature did not intend for reasonable efforts to be linked to the statutory grounds in the manner suggested by DHHS. First, the permissible statutory grounds for termination of parental rights are found in Section 19b of the Probate Code of 1939, MCL 710.21 *et seq*., but the statutory requirement that reasonable efforts toward reunification be made is found in sections 19a[5] and 18f.[6] Moreover, the only mentions of "reasonable efforts" made in section 19b are in reference to the requirement that reasonable efforts be made to locate a parent prior to terminating parental rights on the basis of desertion and in reference to the requirement that the court order no "additional efforts for reunification" if it finds that statutory grounds have been established and that termination is in the child's best interests. See MCL 712A.19b(3)(a)(*i*), (5).

We also note that if we held that the reasonable efforts requirement is tied to the statutory grounds this would imply that DHHS would have to prove that it provided reasonable efforts toward reunification by clear and convincing evidence.[7] But we know of no authority suggesting that this is the case. Finally, we note that, at least in the context of the case before us, concluding that respondent-father's no-contest plea waived his right to assert a reasonable efforts challenge would fly in the face of the requirement of a knowing and intelligent waiver. See *Patel*, 324 Mich App at 634 ("A waiver consists of the intentional relinquishment or abandonment of a known right."). We have reviewed the record, including the transcript of the plea hearing, and it was never explained to respondent-father that pleading no contest to the statutory grounds would bar him from asserting that DHHS failed to make reasonable efforts toward reunification.

In conclusion, the requirement that reasonable efforts be made toward reunification is distinct from the requirement that at least one statutory ground for termination of parental rights be established by clear and convincing evidence. Therefore, respondent-father's waiver of his right to contest the statutory grounds for termination did not also waive his right to contest the adequacy of DHHS's reunification efforts.

## C. CASE SERVICE PLAN

DHHS flouted its statutory obligations by failing to prepare a written case service plan and to update the case service plan every six months; however, this unpreserved error does not warrant reversal because respondent-father cannot show that it affected his substantial rights.

---

Finally, DHHS cites a handful of this Court's unpublished opinions, but those are not entitled to deference. MCR 7.215(C)(1).

[5] MCL 712A.19a(2) provides that "[r]easonable efforts to reunify the child and family must be made in all cases" unless aggravating circumstances are present.

[6] MCL 712A.18f(2) requires that DHHS create a case service plan, and Subsection 3 requires that the case service plan outline the efforts that are to be made by both DHHS and the respondent to enable the child's safe return to the parents.

[7] See MCL 712A.19b(3) (articulating clear and convincing evidence standard for statutory grounds).

As was discussed in the preceding section, DHHS is required to make reasonable efforts toward reunification before a parent's rights may be terminated. *Hicks/Brown*, 500 Mich at 85. "As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86.

> "Case service plan" means the plan developed by an agency and prepared under [MCL 712A.18f] that includes services to be provided by and responsibilities and obligations of the agency and activities, responsibilities, and obligations of the parent. The case service plan may be referred to using different names than case service plan including, but not limited to, a parent/agency agreement or a parent/agency treatment plan and service agreement. [MCL 712A.13a(1)(d).]

The requirements for a case service plan are found in MCL 712A.18f, which provides in relevant part:

* * *

> (2) Before the court enters an order of disposition in a proceeding under section 2(b) of this chapter, the agency shall prepare a case service plan that shall be available to the court and all the parties to the proceeding.

> (3) The case service plan shall provide for placing the child in the most family-like setting available and in as close proximity to the child's parents' home as is consistent with the child's best interests and special needs. The case service plan shall include, but is not limited to, the following:

> (a) The type of home or institution in which the child is to be placed and the reasons for the selected placement.

> (b) Efforts to be made by the child's parent to enable the child to return to his or her home.

> (c) Efforts to be made by the agency to return the child to his or her home.

> (d) Schedule of services to be provided to the parent, child, and if the child is to be placed in foster care, the foster parent, to facilitate the child's return to his or her home or to facilitate the child's permanent placement.

> (e) Except as otherwise provided in this subdivision, unless parenting time, even if supervised, would be harmful to the child as determined by the court under section 13a of this chapter or otherwise, a schedule for regular and frequent parenting time between the child and his or her parent, which shall not be less than once every 7 days.

> (f) Efforts to be made by the supervising agency to provide frequent in-person visitation or other ongoing interaction between siblings unless the court

determines under section 13a of this chapter that sibling visitation or contact will not be beneficial to 1 or more of the siblings.

(g) Conditions that would limit or preclude placement or parenting time with a parent who is required by court order to register under the sex offenders registration act.

(4) Before the court enters and order of disposition, the court shall consider the case service plan . . . .  The court may order compliance with all or any part of the case service plan as the court considers necessary.

(5) If a child continues in placement outside of the child's home, the case service plan shall be updated and revised at 90-day intervals . . . .  The agency shall consult with the foster parents when it updates and revises the case service plan, and shall attach a statement summarizing the information received from the foster parents to the updated and revised case service plan.  Updated and revised case service plans shall be available to the court and all the parties to the proceeding. . . .

* * *

There is no initial case service plan in the legal or social files presented to this Court, and DHHS also has not provided a case service plan as an appendix to its brief.  DHHS argues that the caseworker "placed the terms of a [service plan] on the record," but offering testimony regarding a plan does not satisfy the statutory mandate that there be a written plan in place.  The closest to an initial service plan in the lower court record was a section near the end of the initial dispositional order that listed requirements of respondent-father, including that he participate in drug screens, participate in parenting classes, obtain suitable housing, and other similar requirements.  This list of court orders to respondent-father does not satisfy the requirements of MCL 712A.18f(3).

Even if there was an initial service plan satisfying the statutory requirements that did not get transmitted to this Court, DHHS still has not satisfied its duties because the service plan must be updated every 90 days.  See MCL712A.18f(5).  DHHS argues that it met the requirement to update the service plan by creating "court reports" every 90 days.  These court reports are backward-looking documents that essentially provide status updates and brief lists of recommendations.  However, the required service plan should be a forward-looking blueprint for facilitating the return of the child to the parent.  These reports do not detail the efforts that the agency will make to facilitate reunification nor do they include a schedule of services that will be provided to the parent, child, and foster family to facilitate the child's return.  See MCL 712A.18f(3).  Simply put, while these progress reports were helpful resources for the court's reference, they are no substitute for a detailed plan outlining the services that will facilitate the child's return.

However, as noted above, this issue is unpreserved and is therefore subject to plain error review.  The first requirement of plain error review is that there was an error, and this prong has been established.  See *VanDalen*, 293 Mich App at 135.  The second requirement of plain error review is that "the error was plain, i.e., clear or obvious . . . ."  *Id*. (quotation marks and citation omitted).  "A 'clear or obvious' error under the second prong is one that is not subject to reasonable

dispute." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted). The failure to provide and regularly update a case service plan for a child protective proceeding in which a minor child was separated from a parent is a clear and obvious error. Finally, reversal is only warranted pursuant to the plain error standard if it affected respondent-father's substantial rights. *VanDalen*, 293 Mich App at 135. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Utrera*, 281 Mich App at 9. This is where respondent-father's claim fails because, as detailed in the next section, DHHS did offer significant services and made adequate efforts toward reunification; however, respondent-father was chronically noncompliant and wholly failed to benefit from the services offered. Therefore, respondent-father cannot establish that he would have successfully attained reunification if a proper case service plan had been prepared and regularly updated.

While respondent-father has not raised a claim of ineffective assistance of counsel,[8] we will briefly address that issue to foreclose the possibility that he might, in the future, attempt to raise a claim of ineffective assistance of appellate counsel. It is well established in Michigan jurisprudence that the law governing ineffective assistance of counsel in the context of criminal proceedings applies by analogy to termination proceedings. See *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). Therefore, reversal would be warranted if it is "shown that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *Id*. at 85. Respondent-father's attorney failed him by not demanding that a formal case service plan be prepared and regularly updated in compliance with the applicable statutes; however, a claim of ineffective assistance would nevertheless fail because respondent-father cannot establish prejudice. As noted above in the plain error analysis, this error by trial counsel did not prejudice respondent-father because he nevertheless was offered adequate services but failed to comply and benefit. "The standards for 'plain error' review and ineffective assistance of counsel are distinct, and therefore, a defendant can obtain relief for ineffective assistance of counsel even if he or she cannot demonstrate plain error." *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020), citing *People v Randolph*, 502 Mich 1; 917 NW2d 249 (2018). However, in the context of this particular case, the same facts preclude relief with respect to both standards.

## D. REASONABLE EFFORTS

In addition to his contention that DHHS failed to prepare a case service plan, respondent-father argues more generally that DHHS failed to provide adequate services. We disagree.

Respondent-father's substance abuse was the primary barrier to reunification, and the record shows that DHHS made reasonable efforts to help respondent-father overcome his substance abuse disorder. DHHS provided respondent-father with multiple referrals for substance-abuse assessments, substance-abuse counseling, inpatient and outpatient substance-abuse services, a methadone clinic, and drug screenings. At every parenting-time visit, the caseworker gave

---

[8] There was a statement in respondent-father's brief suggesting that respondent-father's trial counsel "failed to make an adequate record," but that is not the same as formally raising and developing an argument.

respondent-father contact information for substance-abuse counseling centers and encouraged his participation, and respondent-father did participate in a substance-abuse assessment and also an inpatient detoxification program. In addition to services to address respondent-father's drug addiction, petitioner offered other reunification services such as: parenting classes, which respondent-father completed, home assessments, and supervised parenting time. Contrary to respondent-father's claim that he was never offered transportation assistance, the record indicates that when respondent-father reported having car trouble the caseworker offered him gasoline cards and bus passes. DHHS also conducted at least three family team meetings with respondent-father's participation, and respondent-father was given the dates and times of MJC's mental-health therapy and dental appointments. The caseworker and the foster mother kept respondent-father informed of MJC's medical and behavioral issues and treatment, which was also discussed during periodic review hearings that respondent-father attended.

Despite all these services, respondent-father failed to rectify the main reason why MJC was placed into protective custody—his drug addiction. After more than two years of offered services, respondent-father continued to test positive for cocaine at every one of his visits with MJC, including during the months immediately preceding the best-interests hearing. Moreover, respondent-father repeatedly missed drug screens, at times failed to provide required documentation of service participation, failed to maintain contact with his caseworker, and missed several parenting time sessions. Although DHHS has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of the respondent-parent to participate in the services and demonstrate having benefited from them. *Atchley*, 341 Mich App at 339. In this case, respondent-father participated in some of the services offered, but he failed to benefit from them. Moreover, respondent-father has not specified any additional services DHHS could have provided for him that would have better helped him to overcome his addiction. Therefore, he has not established plain error.

## III. BEST INTERESTS

The trial court did not clearly err by finding that terminating respondent-father's parental rights was in the child's best interests.

This Court reviews for clear error a trial court's determination that petitioner has proved by a preponderance of the evidence that termination of parental rights was in the child's best interests. *In re Moss*, 301 Mich App 76, 90; 823 NW2d 144 (2013); *In re JK*, 468 Mich 202, 209; 661 NW2d 216 (2003); MCR 3.977(K). "A circuit court's decision to terminate parental rights is clearly erroneous if, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *JK*, 468 Mich at 209-210. "[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The focus of the best-interests inquiry is on the child, not the parent. *Moss*, 301 Mich App at 87. The trial court may consider various factors when making its best-interests determination, including the child's bond to the parent, *In re Olive/Metts Minors*, 297

Mich App 35, 41-4; 823 NW2d 144 (2012), the parent's parenting ability, *In re Jones*, 286 Mich App 126, 129-130; 777 NW2d 728 (2009), and the child's need for permanency, stability, and finality, *In re Gillespie*, 197 Mich App 440, 446-447; 496 NW2d 309 (1992). Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, *Jones*, 286 Mich App at 131, and a parent's substance-abuse history, *In re Rippy*, 330 Mich App 350, 361; 948 NW2d 131 (2019). The court may also consider whether the parent can provide a permanent, safe, and stable home. *Frey*, 297 Mich App at 248-249. Additionally, the court may consider "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the [child's] well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (citations and quotation marks omitted). The trial court's findings need not be extensive; "brief, definite, and pertinent findings and conclusions on contested matters are sufficient." MCR 3.977(I)(1).

In this case, there was abundant evidence to support the trial court's determination that it was in the child's best interests to terminate respondent-father's parental rights. It is undisputed that respondent-father had suitable housing and employment, and had derived some benefit from parenting classes. However, respondent-father could not provide the child with a safe and stable home because of his entrenched drug addiction. See *In re AH*, 245 Mich App 77, 89; 627 NW2d 33 (2001) (a parent's history of substance abuse is relevant to whether termination is in the child's best interests).

Respondent-father remained addicted to drugs more than two years after the child was removed from his care. Although respondent-father completed a parenting course, his failure to address his drug addiction casts doubt on his ability to benefit from that service. Other than participating in an inpatient rehabilitation program, which he left early, he never engaged in substance-abuse counseling or other substance-abuse services, despite numerous referrals, including treatment through Community Medical Network and Easter Seals. Throughout the case, respondent-father consistently missed drug screens or tested positive for various drugs, including cocaine, heroin, morphine, and fentanyl. He tested positive for cocaine more than 45 times, including all his drug tests in the four months preceding the best-interests hearing. In the weeks leading up to the best-interests hearing, the levels of cocaine in respondent-father's system actually increased. As of the time of the best-interests hearing, respondent-father was still testing positive for drugs, was not compliant with drug screens, and was not in substance-abuse treatment. The trial court reasonably concluded that respondent-father attended parenting time with the child while visibly under the influence, given his observed appearance and demeanor, and that he had positive drug screens during that time.

The proofs further showed that it was unlikely that respondent-father would be able to provide the child with safety and stability within a reasonable time. As of the best-interests hearing, respondent-father had been using drugs for 19 years. Although he had achieved several periods of sobriety, he always ended up relapsing, most recently after completing a two-week detoxification program. Although he asserted that it was unlikely that he would relapse because he had a new job that was more conducive to sobriety, he continued to test positive for cocaine after starting that job. Despite more than two years of services to help him achieve sobriety, respondent-father admitted at the best-interests hearing, "I'm not there yet." The evidence similarly supported the trial court's conclusion that respondent-father's drug addiction endangered MJC. When the child was only 11 months old, she had to be hospitalized after ingesting opiates

and fentanyl. Respondent-father tested positive for those same drugs two days later, leading to the trial court's conclusion that MJC had ingested respondent-father's drugs. However, respondent-father denied that MJC took his drugs and maintained that she was hospitalized because of ingesting Benadryl.

Respondent-father also had a history of criminal behavior bearing on his ability to care for MJC. He was recently convicted of defrauding a client of his fence company. He also spent about a month in jail in August and September 2022. Respondent-father's criminal history additionally included illegally trafficking Oxycodone, spending a year in jail for drug possession, and two convictions for operating while intoxicated. His driver's license was suspended because of his alcohol offenses, yet he illegally drove to his visits with MJC as well as other places. Further, respondent-father was on probation at the time of the best-interests hearing, and there was an outstanding warrant for his arrest because he had failed to complete drug screens as a condition of probation. As the psychological evaluator noted, it would have been difficult for respondent-father to provide MJC with a stable home if he continued to be in and out of jail, and could not legally drive MJC to medical appointments, therapy, or daycare.

The record further supported the trial court's finding that respondent-father did not have a strong bond with the child. The psychological evaluator opined that there was only a weak bond between respondent-father and the child. While the child recognized him as her father, she also called the foster father "dad." Respondent-father missed 29 out of 60 parenting times with MJC, and MJC's behavior worsened on the days following her visits with him but improved after his parenting time was suspended.

Both the caseworker and the psychological evaluator opined that it was in MJC's best interests to terminate respondent-father's parental rights. MJC had medical, cognitive, and behavioral issues, including speech delays, aggression toward others, asthma, bronchitis, and ear problems, but respondent-father refused to accept that MJC had any developmental, mental, or behavioral issues. The psychological evaluator opined that respondent-father did not consider MJC's needs and was focused on meeting his own needs. She also observed that respondent-father was impulsive and had little motivation to change his present situation, and opined that he would not be able to provide the structure, stability, and permanence necessary for MJC's growth.

The record supported the trial court's findings regarding the child's bond with her foster parents, and the exceptional work the foster parents did caring for her. The foster parents took custody of MJC in October 2020 and retained custody throughout the case. The psychological evaluator concluded that MJC was bonded to her foster mother who was likely the child's primary caregiver. When the foster parents would arrive to pick MJC up from visits with respondent-father, she would immediately go to her foster parents and easily separate from him. Outside of visits, MJC rarely mentioned respondent-father or asked to see or speak to him. The caseworker and the psychological evaluator reported that the foster parents had addressed MJC's special needs, and that the child was thriving. They went "above and beyond" for MJC, including speech therapy, mental-health treatment, occupational therapy, and behavioral therapy.

As the trial court explicitly noted, placement with a relative weighs against termination, but that fact is not dispositive. See *Olive/Metts*, 297 Mich App at 43. MJC's foster mother is respondent-father's aunt. Further, the caseworker testified that guardianship would not give MJC

needed permanency, stability, and finality. At the time of the best-interests hearing, MJC had been in the foster parents' care for well over half of her short life. The foster parents' plan to adopt her offered the young child the permanency she needed.

## IV. CONCLUSION

In conclusion, DHHS violated the relevant statutory provisions by failing to prepare and regularly update a case service plan, and respondent-father did not waive his right to raise this issue by entering a no contest plea to the statutory grounds. However, this error does not warrant reversal because respondent-father was nevertheless offered adequate services, failed to comply with and benefit from the services, and has failed to establish how the outcome would have been different if a formal service plan had been prepared and updated. Finally, the trial court did not clearly err by finding that termination of respondent-father's parental rights was in the best interests of the child.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Mark T. Boonstra
/s/ Michael F. Gadola